**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **DALLAS INDEPENDENT** | § | |
| **SCHOOL DISTRICT** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **T.S. by next friends ANGELA B.** | § | |
| **AND TRUMAINE S.,** | § | |
| | § | |
| **Defendant.** | § | |

**<u>PLAINTIFF'S ORIGINAL COMPLAINT</u>**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff Dallas Independent School District ("Dallas ISD or the "District") and files this Original Complaint against T.S. by next friends Angela B. and Trumaine S seeking relief from an adverse decision rendered by a Hearing Officer appointed by the Texas Education Agency ("Hearing Officer") pursuant to the due process provisions of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* and would respectfully show the Court as follow:

## I.    PARTIES

1.     Plaintiff Dallas ISD is a public school district and political subdivision of the state of Texas, and, as such, has the responsibility to implement the provisions of the IDEA as a local educational agency ("LEA") to ensure that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 42 U.S.C. §§ 1400(d)(1)(A), 1401(19).  Dallas ISD conducts its principal operations at 9400 N. Central Expressway, Dallas, TX 75231.

2.      Defendant T.S. ("Student" or "T.S.") is a minor who attended Dallas ISD during the 2018-2019 school year, and who is represented as next friends in this suit by his parents and guardians, Angela B. and Trumaine S. (collectively "the Parents"). Defendant may be served, as requested, through his attorney of record, Sonja Kerr, Connell Michael Kerr, LLP, 9600 Great Hills Trail, Suite 150W, Austin, Texas 78759.

## II.    VENUE AND JURISDICTION

3.      This action is brought pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 et seq.

4.      This court has jurisdiction over this controversy pursuant to 20 U.S.C. §§ 1415(i)(2), (i)(3)(A). This court has express appellate jurisdiction over administrative rulings issued pursuant to the IDEA.

5.      Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(b), as all actions that form the basis of the claim occurred within the geographic boundaries of the United States District Court for the Northern District of Texas.

## III.    EXHAUSTION OF REMEDIES

6.      This is an appeal from the decision of a Special Education Hearing Officer appointed by the Texas Education Agency ("TEA") to preside over the special education due process hearing ("Hearing") in Docket No. 289-SE-0519 styled *Dallas Independent School District v. T.S. b/n/f Angela B. and Trumaine S.* The Hearing occurred on July 31, 2019, August 12, 2019, and September 12, 2019, and the Hearing Officer rendered her decision on November 1, 2019.

7.      Plaintiff has exhausted its administrative remedies as required under 20 U.S.C. § 1415(i), having undergone a due process hearing and having timely filed this appeal.

## IV.    OVERVIEW

8.      Under the clear language of the IDEA, before a school district may provide special education and related services to a child, the school district must conduct "a full and individual initial evaluation in accordance with this paragraph and subsection (b)."    20 U.S.C. § 1414(a)(1)(A)(emphasis added).  Subsection (b) states that "each local educational agency shall ensure that—the child is assessed in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B). Section 300 of the Code of Federal Regulations, the regulations implementing the IDEA, tracks the language of the statute except that it expands on the requirement in that it clearly states that a school district "must ensure that—the child is assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities" and that "the evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(4),(6).

9.      Dallas ISD must first obtain parental consent in order to conduct the initial evaluation. *See* 20 U.S.C. § 1414(a)(1)(D).  If the parents do not consent to the evaluation, the school district is not required to pursue an initial evaluation of a child suspected of having a disability. *See* 34 C.F.R. § 300.300 (a)(3)(i). However, if the school district wants to conduct the evaluation despite lack of parental consent, the school district may file a due process complaint to obtain an order permitting the evaluation. *See* 20 U.S.C. §§ 1414(a)(1)(D)(ii), 1415.

10.      In the instant case, Dallas ISD obtained consent from T.S.'s parent to conduct a full and individual initial evaluation of T.S.  The consent form that T.S.'s mother signed clearly indicated that she was consenting to a "full and individual evaluation in all areas of suspected

disability." And, T.S.'s mother, an experienced diagnostician and special education teacher herself, was informed at the time of consent and knew that the evaluation could be expanded if other areas of disability or need were suspected during the pendency of the evaluation.

11.     At the time the consent was signed, the areas of suspected disability and/or need were Specific Learning Disability (SLD) for possible dyslexia, occupational therapy for fine motor deficits, and speech. However, as the evaluation for those areas progressed, three evaluators, who all had broad and extensive experience evaluating and serving students with autism, as well as other campus personnel who had worked with T.S., believed that T.S. exhibited numerous characteristics indicative of a student with autism.

12.     In addition, both the evaluators and the campus personnel believed that T.S.'s needs went beyond dyslexia, fine motor needs, and speech. In fact, even the parent provided additional information during the pendency of the evaluation from a private evaluation diagnosing T.S. with dyslexia and Attention Deficit Hyperactivity Disorder Combined Type (ADHD) – information which was not known at the time of consent.

13.     Furthermore, during the school year, T.S. was provided numerous interventions and general education supports, as well as accommodations and services under Section 504 of the Rehabilitation Act of 1973 ("Section 504"), but was continuing to struggle both academically and behaviorally. As such, to comply with its legal obligation to fully evaluate T.S. in all areas of suspected disability, Dallas ISD notified T.S.'s parents that the full evaluation would need to include conducting additional testing for autism, gathering information from a medical doctor for his diagnosis of ADHD, and considering T.S.'s social and emotional needs as it related to the suspicion of autism and/or ADHD.

14.     In response to this information, the parents revoked their consent for the evaluation.

Specifically, on February 4, 2019, the mother indicated in an email that she wanted to "hold off on the Autism evaluation. I need time to ensure that his dad is ok with the additional testing." Then, in a February 5 email, the mother indicated the following: "I have spoken with [T.S.'s] dad and we have decided that we do not want additional testing at this time for Autism." Then, in a February 7, 2019 email, the mother reiterated that, "[a]t this time, we continue to decline additional evaluations for our son, [T.S]." However, the parent also indicated in that same email that she "would like for the cognitive and achievement parts of the evaluation to be completed…Also, with ADHD, OHI should be considered…. If [T.S.] continues to display behaviors similar to what you described across all settings, we will be willing to follow up with additional evaluations at that time." With these responses, T.S.'s parents revoked their consent for a full and individual evaluation of T.S.

15.     The parents' actions clearly indicated that Dallas ISD no longer had consent to evaluate T.S. in all areas of suspected disability; therefore, Dallas ISD no longer had consent to conduct an initial evaluation consistent with its obligations under 20 U.S.C. § 1414(b). Because parental consent was revoked, Dallas ISD stopped the evaluation, consistent with 34 C.F.R. § 300.300. However, as allowed by the provisions of the IDEA, Dallas ISD filed a due process hearing request so that it could proceed with the initial evaluation of T.S. in all areas of suspected disability in compliance with the clear language of the law.

16.     On November 1, 2019, a hearing officer appointed by the Texas Education Agency issued her decision in the due process hearing. Without even addressing the clear language of the IDEA which requires that a school district ensure that a child is assessed in all areas of suspected disability, the hearing officer denied Dallas ISD's request to override parental consent to evaluate T.S. in all areas of suspected disability, including autism. The hearing officer then ordered Dallas

ISD to complete an evaluation in only the areas requested by the parent and convene an Admission, Review and Dismissal ("ARD") Committee meeting to consider this evaluation. Dallas ISD files this appeal seeking relief from this adverse decision.

## V.    FACTS

### A.    Background and Historical Information

17.    Defendant T.S. was enrolled in Dallas ISD for only one school year, the 2018-2019 school year, as a first-grade student starting on August 20, 2018.

18.    T.S. is now a seven-year-old student who is currently enrolled for the 2019-2020 school year at The Winston School, a private school for students from grades K-12 with learning differences. T.S.'s parents voluntarily withdrew T.S. from Dallas ISD at the end of the 2018-2019 school year and unilaterally placed him at The Winston School.

19.    When T.S. was four years old, his parents had him evaluated by Easter Seals North Texas for Occupational Therapy. While sensory processing was not fully assessed due to his age, the Easter Seals evaluation noted that T.S. required frequent cues to attend to testing directions and stay on task; exhibited some tactile defensiveness/hypersensitivity including sometimes leaning on furniture or objects, sometimes seeking opportunities to jump, crash and fall, and sometimes squeezing too tightly when hugging or holding hands; and exhibited some vestibular hypersensitivity by sometimes covering his ears in anticipation of noise. At the time, the evaluator indicated that, while T.S.'s scores did reveal a delay, it could be due to his lack of schooling. Thus, occupational therapy was not recommended at the time, but it was recommended that T.S. be reevaluated in 6 months. The parents did not pursue a subsequent evaluation for Occupational Therapy until T.S. was in the first grade.

20.    T.S. attended Kindergarten during the 2017-2018 school year at Woodridge Fine

Arts Magnet Academy in DeSoto Independent School District ("DeSoto ISD"), another public school district in the state of Texas. T.S.'s kindergarten teacher in DeSoto ISD was Ms. Ashley Medina.  In Kindergarten, Ms. Medina recalled some delay with reading and some difficulty with writing for T.S.  She also indicated that T.S. had difficulty with eye contact and, at least during the first marking period, was inconsistent in the following areas: assuming responsibility for self; listening and following directions promptly; cleaning up willingly; working well independently; working neatly and carefully; orally generating rhymes in response to spoken words; and identifying and reading high-frequency words.  While Ms. Medina indicated that she did not have any reason to believe that T.S. might have autism, she also indicated that she had no reason to suspect a learning disability.  Further, she admitted that she was not a trained evaluator, was not certified in special education, and had never taught students with autism in her three years of teaching.  She also admitted that she did not have personal knowledge of T.S.'s academic or behavioral needs or his performance in the first grade at Dallas ISD, but did indicate that first grade was more demanding than kindergarten.  And, Ms. Medina further indicated that it was important to have full information about a student's suspected disabilities and needs and that it would be difficult to teach a student if the school district was not able to assess or evaluate all of the student's needs.

**B.    T.S.'s Enrollment and First Grade Year at Dallas ISD – General Information**

21.    During the 2018-2019 school year, T.S. attended first grade at George Bannerman Dealey Montessori Vanguard and International Academy ("Dealey"), a Dallas ISD magnet school, for which the students apply for admission.  Dealey was not T.S.'s home school, but was chosen by T.S.'s parents.

22.    T.S.'s first grade teacher at Dealey was Elizabeth Matere.

23.    At Dealey, T.S. was in a Montessori-style, multi-grade classroom with twenty-two (22) students, including eight (8) first graders, seven (7) second graders, and seven (7) third graders. None of the first graders had previously attended a Montessori program.

24.    T.S. first began wearing glasses at the beginning of the 2018-2019 school year. He has had three or four different pairs due to them being lost or destroyed, and, at times, did not wear his glasses to school.

## C.    Behaviors Exhibited by T.S. During the 2018-2019 School Year Raised Suspicions of Autism and a Need for a Full Individual Evaluation under the IDEA.

25.    Within the first few weeks of the 2018-2019 school year, Ms. Matere, T.S.'s teacher, had concerns about T.S.'s social behaviors and academic performance.  Ms. Matere expressed that T.S. was putting his head down on the desk, making noises, falling out of his chair, and failing to complete work assigned to him.  Further, Ms. Matere reported that T.S. had difficulty concentrating on and completing his work, would sit under the table, break the lead on his pencils, and did not follow the classroom rules and procedures.  Specifically, Ms. Matere noted that T.S. needed improvement in the following areas:  engagement in work most of the time; ability to follow directions in class and at table time; good listening skills during table time; and ability to concentrate on lessons during table time.  She also noted that T.S. was tearing papers out of his notebook, playing with his glasses, shoes and/or pencils, failing to complete or initiate work, requiring extensive one-on-one assistance, playing or falling on the floor, needing a lot of prompting, making noises, sleeping or putting his head on his desk, and flipping his fingers.  She reported that these behaviors continued throughout the 2018-2019 school year, the frequency of which was both noted and reported to the parents.

26.    In regard to academics, Ms. Matere had concerns about T.S.'s reading, mathematics, and handwriting skills.  Specifically, Ms. Matere reported that T.S. was not able to

work independently like the other first graders and was below average in almost all academic areas. While she indicated that he made a "little" or some progress, Ms. Matere's concerns about T.S.'s academic performance continued throughout the 2018-2019 school year.

27.     Ms. Matere met and communicated with the parents regarding her concerns and T.S.'s lack of progress on numerous occasions throughout the school year, with the first meeting held on September 8, 2018

28.     As a teacher, Ms. Matere believes it is important to assess T.S. in all areas because "as a teacher, if I don't know what T.S. needs, it's difficult...as a teacher, I would like to know what I need to do to help him to be more successful."

29.     On October 10, 2018, the parent emailed Ms. Julieta Henderson, the Assistant Principal, expressing concerns about T.S.'s academic progress, reading skills, handwriting, processing speed, short-term working memory, and long-term retrieval abilities. She stated that T.S. has become withdrawn, unmotivated, sad, and frustrated about school.  In the email, the parent requested a Student Support Team ("SST") meeting.

30.     The following day, on October 11, 2018, Ms. Henderson met with the parents regarding their concerns as well as the concerns of the teacher.  While this was not an official SST meeting, this meeting and the school's subsequent actions essentially served the same purpose as an SST meeting and were part of the SST process.  Specifically, during the meeting, Ms. Henderson told the parent that she would conference with Ms. Matere regarding classroom interventions.  She also stated that she would meet with Ms. Latasha Winners, the school Counselor, to observe T.S. in the classroom and work with him to address his engagement and self-confidence.  Additionally, Ms. Henderson agreed to provide T.S. three to four leveled books, which would be switched out upon mastery, to practice at home and in the classroom.

31.     On October 16, 2018, Ms. Henderson requested that Ms. Winners observe T.S. for self-confidence and engagement concerns. Ms. Winners completed two (2) formal classroom observations of T.S. on October 17 and October 26.  Specifically, during the October 17 observation, Ms. Winners observed that T.S. had difficulty initiating a task, did not self-start or move on to the next activity, and did not know what to do.  T.S. needed frequent redirection and would become stuck on work without a teacher to coach him on the next steps.  T.S. also made noises at times and required a lot of help with organization.  These behaviors, which are not typical of a first grader in October, could possibly be related to autism spectrum disorder and supported the need for a comprehensive evaluation in all areas of suspected disability.

32.     On October 26, 2018, Ms. Winners conducted a second classroom observation. During this observation, Ms. Winners observed T.S.'s head down and noticed that he could not read some of the words, had difficulty participating, did not know how to put his work back, and needed extensive assistance and redirection.  Ms. Winners further noted that T.S. would say each number aloud as he wrote math problems.  These behaviors were not typical for a first grader in October, were indicative of autism, and supported the need for a comprehensive evaluation.

33.     Ms. Winners also administered the TerraNova test to T.S. at the end of the school year in a one-on-one setting, where she observed the need for frequent redirection and assistance during testing atypical for a first-grade student. These behaviors supported the need for a comprehensive evaluation.

34.     Ms. Winners has been employed by Dallas ISD for over eighteen (18) years, as a teacher for five (5) years, and a school counselor for over thirteen (13) years.  She also served as the Section 504 Chair at Dealy.  She holds a Texas teacher certification (early childhood through grade 4) and a school counselor certification (early childhood through grade 12).  Ms. Winners has

a Master's degree in Counseling and a Bachelors of Science degree in Social Work and a Minor in Sociology from Texas Woman's University and Prairie View A&M University.  She has been extensively trained in special education referrals and has years of experience working with students with disabilities, including autism.

35.    Ms. Winners expressed the following concerns with respect to T.S.'s behaviors during the 2018-2019 school year: speaking in a monotone voice; using "off phrases that did not make sense or have anything to do with the topic;" behavioral disturbances in class where he would fall out of his seat or go under his desk; making funny repetitive noises with his mouth; different facial expressions and body movements during conversation, including frowning and frequent shrugging of the shoulders; and staying stuck on certain topics and not being able to move from them.  Ms. Winners believed that these behaviors were similar to those she has seen in students identified with autism.

36.    As a counselor and educator for eighteen (18) years who frequently works with special education students, Ms. Winners believes that it is important for the District to be able to assess T.S. in all areas of suspected disability:  "T.S. deserves everything that any other child deserves.  And he's a sweet, lovable kid.  So, he deserves a fair chance just like every other child.  And in order to do that, you have to get a full picture so you will know what you're – what to do to help him and to give him what he needs and what he deserves."

37.    Ms. Julieta Henderson, Assistant Principal at Dealey, personally observed T.S. in the classroom three (3) to four (4) times a week, formally and informally during the 2018-2019 school year, as well as provided T.S. with small group reading interventions three (3) times a week.  During these observations, Ms. Henderson grew concerned regarding T.S. not knowing what to do, needing many redirections, needing assistance, needing one to two-step directions, and not

being able to initiate tasks.  At times, T.S. would be on the floor or have his head down on the desk.  He also had difficulty interacting with other students in the classroom.

38.     Specifically, on December 19, 2018, Ms. Henderson reported the following concerns regarding T.S.:  easily distracted, frequently has difficulty shifting to new tasks, prefers to be alone, has trouble reading body language, struggles to relate to peers, does not communicate well with classmates, avoids group activities or classroom discussion, and has difficulty in the areas of mental energy, vigilance, intentional/active awareness, impulsivity, hyperactivity, emotional regulation, and relationships.

39.     Ms. Henderson was employed by Dallas ISD for nineteen (19) years, as a teacher for ten (10) years, an Academic Coordinator for 1 year, and an Administrator for eight (8) years. She has also served as the SST Chair and ran a reading interventionist student small group pull-out program at Dealy.  She holds a Texas teacher certification (grade 1 through grade 8), a bilingual/ESL-Spanish certificate (grade 1 through grade 8) and a principal certification (early childhood through grade 12).  Ms. Henderson has a Masters Degree in Educational Leadership and a Bachelors Degree in Occupational Therapy from Texas A&M University at Commerce.  She has been trained in special education referrals, dyslexia, ADHD, autism and has years of experience working with students with disabilities, including autism, dyslexia, and ADHD.

40.     Based on her observations of T.S. throughout the school year, Ms. Henderson suspected that T.S. was exhibiting characteristics of autism.  Specifically, Ms. Henderson reported the following behaviors exhibited by T.S. which led her to suspect autism:  does not follow simple commands, prompt dependent, repeats phrases over and over again, prefers to manipulate inanimate objects, flaps hands at times, rolls on the floor, lethargic most of the time.

**D.     Numerous Interventions Provided During the 2018-2019 School Year with Minimal Progress Led to Suspicion of Autism and Need for Full Individual Evaluation.**

41.    Ms. Matere implemented numerous classroom interventions for T.S. throughout the 2018-2019 school year, including one-on-one instruction; small group in-class instruction; ISIP on demand assessments; modified work plans; peer tutoring; leveled books; and numerous classroom accommodations (including shortened assignments, extra time, supplemental aids, and oral administration).

42.    Starting on November 12, 2018, T.S. was also pulled out three times a week for forty-five (45) minutes for small group reading instruction with Ms. Henderson. Specifically, T.S. was in a group with three students and worked on sounds, decoding, the alphabet, and CVC words with a phonics program.  However, T.S. made minimal progress even with these interventions.

43.    Starting in January of 2019, after the parents sought a private evaluation from Scottish Rite (and during the pendency of Dallas ISD's special education evaluation under the IDEA), T.S. was identified as a student with a disability under Section 504 of the Rehabilitation Act of 1973 ("Section 504") for dyslexia, ADHD, and handwriting issues, and was provided Section 504 accommodations and dyslexia services with the consent of the parent.

44.    Specifically, starting after the January 30, 2019 Section 504 meeting, and as agreed to by the Section 504 Committee, T.S. was to receive sixty (60) minutes a week of the dyslexia phonics kit in four to five sessions per week from Ms. Henderson in a one-on-one pull-out program. The Section 504 Committee also recommended numerous accommodations including supplemental aids for assignments and testing, reminders to stay on task, extra time for assignments and testing, shortened assignments, oral administration of assignments and testing, frequent breaks for assignments and testing, small group and individual administration for testing. T.S.'s mother signed consent for these Section 504 services on January 30, 2019.

45.    On March 7, 2019, another Section 504 Committee Meeting was held for T.S.  At

that meeting, while the Section 504 Committee indicated that T.S.'s academic performance has improved some with the accommodations that are being provided, it was indicated that the student's behavior performance has diminished.  Dyslexia services were increased to four (4) days per week, thirty (30) minutes per session, of the dyslexia phonics kit.  The Committee also recommended a Behavior Intervention Plan to address T.S.'s escalating behaviors, including off task behaviors and disruptions.  T.S.'s mother was at the March 7, 2019 Section 504 Committee meeting and agreed to these services.

46.    T.S. was provided appropriate, research-based dyslexia services through Section 504 in accordance with the TEA Dyslexia Handbook starting in January of 2019 to the end of the year by three (3) properly trained dyslexia service providers.  Specifically, Ms. Henderson, who was trained by Ashley Hall, provided dyslexia services to T.S. from February 6, 2019 through February 21, 2019 (3 weeks).  Then, from February 26, 2019 through March 7, 2019 (2 weeks), T.S. was provided dyslexia services by Ashley Hall, who is a trained Dyslexia Interventionist and Certified Academic Language Therapist (C.A.L.T.).  After Spring Break and for the remainder of the school year, T.S. was then provided dyslexia services four (4) times a week for thirty (30) minutes a session, as determined by his Section 504 Committee, from Melissa Martinez, a trained Dyslexia Interventionist, who was assigned to Dealy but had been on maternity leave.  Further, the dyslexia program provided to T.S., the phonics kit, was provided by all three of these dyslexia service providers and was a research-based program appropriate for T.S.'s age and grade level.

47.    However, despite all of these interventions, Section 504 accommodations, and dyslexia services, T.S. made little progress during the 2018-2019 school year either academically or behaviorally.

48.    At the end of the first semester, T.S. scored 81% on the reading section of ACPs

(District average was 82%) and 54% on the math section of ACPs (District average was 81%). His iStation ISIP scores from October 2018 indicate that T.S. was in Tier 3 for reading, performing at the Kindergarten level.  January 2019 iStation scores for reading indicated that T.S. was still at a Tier 3, meaning he was seriously below grade level and in need of intensive intervention. At the end of the year, T.S. performed at the beginning of first-grade level on the TerraNova assessment.

49.     The campus did not have enough information to know exactly what T.S.'s needs were and his minimal progress on numerous interventions indicated that more information was required.  Without full information, Dallas ISD was unable to meet T.S.'s needs.

50.     At the January 2019 meeting, T.S.'s Section 504 Committee recommended that T.S. receive a full individual evaluation for special education, which was currently in process, based on concerns that T.S.'s minimal progress, unusual behaviors, lack of independence, and need for redirection were caused by more than just dyslexia, ADHD, and handwriting difficulties.

**E.     Parent Requests Special Education Evaluation.**

51.     On October 10, 2018, the parent emailed Ms. Henderson, the Assistant Principal, expressing concerns about T.S.'s academic progress and behavior.  In the email, the parent requested a special education evaluation, including an occupational therapy evaluation, speech evaluation, and dyslexia evaluation.

52.     The very next day, on October 11, 2018, Ms. Henderson met with the parents regarding their concerns and request for evaluation. At the meeting, the parents expressed uncertainty about moving forward with the evaluation and requested an opportunity to further discuss the decision before the evaluation process was initiated.

53.     On October 17, 2018, the parent emailed Ms. Henderson indicating that they had finally decided to proceed with an evaluation for special education.

**F.      Parent Consents to a Full Individual Evaluation in All Areas of Suspected Disability.**

54.      On November 16, 2018, Dr. Beth Palmer, Licensed Specialist in School Psychology (LSSP) met with the parent to obtain consent for a full and individual evaluation under the IDEA. At the meeting, Dr. Palmer provided the parent with the Notice of Procedural Safeguards and the Parent's Guide to the ARD Process, which explains that an initial evaluation will be conducted in all areas of suspected disability and need.  She also extensively explained the process to the parent.

55.      The evaluation was requested by the parent based on reading concerns, as well as processing of information, following directions, handwriting concerns, and speech, which were concerns also shared by the campus. The mother also requested a dyslexia evaluation, due to a history of dyslexia in the family.

56.      During the consent meeting, the parent was informed that the evaluation would begin with her request for the speech, occupational therapy, specific learning disability, and dyslexia concerns. However, Dr. Palmer explained to the parent that the evaluation was not limited to those areas due to the fact that as the evaluation takes place and information is gathered, other areas of suspected disability and related services may need to be addressed in order to do a full and individual evaluation.  At the time of consent, especially for a new or younger student, a school district does not necessarily know all the areas of disability and/or need a student may exhibit. During the pendency of the evaluation, when experienced evaluators assess and observe the student, often other areas of disability and other needs of the child may be suspected necessitating an expansion of the evaluation in order to conduct a full and individual evaluation, as required under the IDEA.  This is explained to the parent at the consent meeting and the parent signs consent for a full evaluation in all areas of disability that are suspected at the time of the consent and during

the process of the evaluation.

57.    For T.S., the top of the consent form included the parent's concerns regarding short-term processing, motor issues, and dyslexia and noted her request for an occupational therapy evaluation and speech evaluation.  At the meeting, the parent also told Dr. Palmer that at home, T.S. needed more support to get things done, such as getting ready for school.  However, while Dr. Palmer indicated that the evaluators would start with these areas and concerns, the evaluation would be conducted in all areas of suspected disability and need, as required by the IDEA.

58.    At that meeting, the parent signed the consent form and agreed that, "[T.S.] will receive a Full and Individual Evaluation in all areas of suspected disability and related services." She also acknowledged and agreed, by her signature, that "this evaluation will include, when appropriate, an evaluation of the student's health, vision, hearing, social/emotional status, general intelligence, academic performance, communication skills and motor abilities.

59.    The same day, Jana Chester, CCC-Speech Language Pathologist; Carmen Anderson, Occupational Therapist; and Dr. Palmer were assigned to complete T.S.'s evaluation in all areas of suspected disability.

**G.    Information Obtained and Reviewed During the Evaluation Led All Three Evaluators to Suspect Autism and Request an Expanded Evaluation.**

60.    As part of the evaluation, Ms. Matere, T.S.'s current teacher filled out a teach input form to provide information to the evaluators regarding T.S.'s class performance.  The evaluators also interviewed Ms. Matere to gain more information.  In her teacher input form, Ms. Matere stated that T.S. does not focus in class, is easily distracted and unable to work independently, loses things, is disorganized, and has difficulty problem solving. Ms. Matere further noted that T.S. was not focusing or working independently, covers his head with his shirt, does not follow the class rules and procedures, breaks his pencils and tears paper out of the spiral books, does not participate

actively and successfully without prompting, does not appear to understand explanations and instructions, does not ask for assistance, and has difficulty maintaining attention. These behaviors all suggest sensory concerns and a possible suspicion of autism according to the Occupational Therapist, Carmen Anderson.  And, according to the LSSP, Dr. Palmer, she suspected that T.S. was evidencing a level of frustration and a need to escape that is common in children with high-functioning autism, based on the teacher information in the referral packet.

61.    As part of the evaluation, the parent also completed the Parent Input Form.  The Parent Input Form stated several parental concerns regarding T.S.'s performance in school, including difficulty concentrating to complete tasks, forming letters, hearing sounds, short-term memory, reading and writing.  Moreover, as the parent reported, T.S. does not like learning to read.  She also noted that T.S. has difficulty holding a fork, pencil, et cetera, correctly.  The parent reported having had concerns since T.S. was four years old.  The parent further stated that T.S. sometimes makes friends and sometimes accepts responsibility of his own actions.  The parent also noted that T.S. will shrug his shoulders and make an "I don't know" face when he is confused.  She also agreed that T.S. has difficulty with attention and needed reinforcement when he is confused about expectations.  According to the Parent Input Form, the parent was mildly concerned with T.S.'s social skills and behavior and very concerned with his emotional needs and self-esteem.  This information led to a suspicion of autism for the evaluators and/or were red flags for the evaluation.

(1)    <u>Expert and Speech Evaluator Jana Chester, MS, CCC-SLP, Suspected Autism and a Need for Education Services and Recommended Further Evaluation.</u>

62.    Jana Chester has served as a speech language pathologist (SLP) in both private practice and schools for over twenty (20) years, over nine (9) of them at Dallas ISD.  Ms. Chester has a BA in Speech Communications from Texas A&M University and a Master's in

Communication Disorders from the University of Texas at Dallas. She is a licensed SLP with the state of Texas and hold her Certificate of Clinical Competence (CCC) from the American Speech Language and Hearing Association. Ms. Chester has extensive training in evaluating and serving students who are eligible for special education services under the IDEA as a student with autism ("AU"), and she has evaluated and/or provided services to students with autism in both the public and private sector for over twenty (20) years. Ms. Chester is an expert in the field of speech-language pathology and evaluating students with autism.

63.     Jana Chester initiated a speech and language evaluation of T.S. in November of 2018. She initiated her evaluation based on her belief that the parent had consented to a full and individual evaluation, which evaluated all areas of suspected disability and need. However, the initial concerns raised by the parents were for articulation only, but Ms. Chester, as is required by law, planned on conducting an evaluation in all areas of speech needs, including articulation and language, as is always done in an initial evaluation.

64.     As part of her assessment, Ms. Chester completed an oral-motor exam, an articulation assessment, a formal language assessment, subtests from the CASL, and a partial pragmatic speech assessment. However, she was not able to complete her speech and language assessment of T.S.

65.     On the pragmatics portion of the OWLS assessment, T.S. had difficulty asking appropriate questions to get information, sequencing events to complete a task or tell a story, and requesting information. Pragmatic speech difficulty, including the difficulty areas T.S. exhibited on the OWLs assessment, is a characteristic of autism according to Ms. Chester's expert opinion.

66.     During her behavioral observations, Ms. Chester observed that T.S. had difficulty sitting still on the stool and staying focused on a topic of conversation and required frequent

reminders to return to the task.  He also wanted to talk about his preferred subject and had a hard time moving on to other topics.  At times, he would state, "she-sha-sha-sha-sha" before answering any questions or make audible noises with his mouth during the assessment, and, at other times, T.S. would respond with a nonsense word that rhymed with the correct word.  While walking back to class, when she walked around the students working in a group in the hallway, Ms. Chester observed T.S. walk straight through the middle of the students, through the students' work, and knock over a pencil sharpener, without even realizing what he had done.

67.    In Ms. Chester's expert opinion, her observations of T.S. are consistent with characteristics of autism, including: pragmatic speech difficulties; focusing on one thing without being able to be redirected; having his own agenda on what he wanted to talk about; making sounds with his mouth; seeking sensory input; falling out of the chair and moving around; inability to understand his surroundings; and not understanding social cues.

68.    Ms. Chester did not complete her speech and language evaluation of T.S. because she was informed that the parents had withdrawn their consent for a full evaluation. However, Ms. Chester identified her concerns to Dr. Palmer via e-mail, stating that she was unsure about pragmatics and lacked a full picture and that T.S. needed an autism evaluation.  She also provided the parent a summary of her observations which detailed the information which led her to suspect autism.

69.    Ms. Chester indicated that an articulation disorder, which was identified during her partial evaluation, is not enough to qualify T.S. for speech because there would not be a full picture of his disabilities.  In Ms. Chester's expert opinion, T.S. requires a full individual evaluation in all areas of suspected disability, including autism, because without it, the school district "wouldn't know the best way to serve him." In fact, a full picture of T.S.'s disabilities is necessary in order

to even provide him speech so that "we can make sure we have the best plan for him, the proper amount of service minutes, the proper goals if we needed to add pragmatic goals to help him."

    (2)    <u>Expert and OT Evaluator Carmen Anderson, OTR, M.Ed., Suspected Autism and a Need for Education Services and Recommended Further Evaluation.</u>

70.    Carmen Anderson served as an occupational therapist (OT) in public education for over forty-four (44) years. She was employed by Dallas ISD as an OT from 1975-2019. Ms. Anderson has a BS in Occupational Therapy from Texas Women's University and a Masters in Education from East Texas State University. She is a licensed OT with the Texas Board of Occupational Therapy Examiners. Ms. Anderson has extensive training in evaluating and serving students who are eligible for special education services under the IDEA as a student with autism ("AU"). Specifically, between 85% to 90% of the evaluations she has conducted have concerns related to autism and 85% to 90% of her caseload for the last ten (10) years have been comprised of students with AU. Ms. Anderson is an expert in the field of occupational therapy and evaluating and serving students with autism.

71.    Carmen Anderson initiated an occupational therapy evaluation of T.S. in January of 2019, which included classroom observations, an interview with the teacher, a review of school records and referral data, a school functional assessment, the Print Tool of manuscript handwriting assessment, a Sensory Processing Measure, and consultation with other evaluators.

72.    During her evaluation, Ms. Anderson selected appropriate measures for the evaluation, including criterion-referenced measures, and took into consideration the classroom that the student is in, particularly in a Montessori program, as well as how T.S. is impacted in a new environment, during the evaluation.

73.    At the time she received the referral, the identified concern was fine motor skills to address handwriting. However, once Ms. Anderson received information relating to T.S.'s

difficulty in reading and behaviors in the classroom, she provided additional testing, including a Sensory Processing Measure. Additional testing was necessary to conduct a complete evaluation that considered all areas suspected of impacting T.S.'s performance. Parental consent is not required when expanding an occupational therapy evaluation to include a Sensory Processing Measure.

74.    A Sensory Processing Measure is an instrument that looks at behaviors within the five sensory areas, as well as two areas that are impacted by sensory deficits, and gives information related to how a child processes information with his/her five senses. The instrument provides a range of functioning within each of the areas. As Ms. Anderson reported, issues with sensory processing can be indicative of autism.

75.    T.S. did not demonstrate typical behaviors in any of the five sensory areas on the Sensory Processing Measure. Specifically, in the area of vision, T.S. scored in the "some problems" range, finding that he is constantly distracted by nearby visual stimuli and unable to maintain attention on the speaker during instruction or announcements.  In the area of hearing, T.S. scored within the "definite different" range, finding that he tended to hum or make noises and sing during class time and became distressed at loud noises. In the area of touch, T.S. scored within the "some problems" range, finding that he demonstrates distress when hands are dirty and when accidentally touched by others.  In the area of body awareness, T.S. scored in the "definite difference" range, finding a tendency to move furniture and things roughly and running or bouncing when he should be walking. In the area of balance and motion, T.S. scored in the "definite difference" range, finding consistent fidgeting when seated at his table, falling out of his chair, leaning on furniture and walls while standing, and poor coordination.  In the area of social participation, T.S. scored in the "some problems" range, finding an inability to resolve peer

conflicts without teacher intervention, inconsistency in working as part of a team, and difficulty entering into an ongoing activity without being disruptive. Finally, in the area of planning and ideas, he scored in the "definite difference" range, finding inconsistency in day-to-day performance, inability to effectively problem solve, inability to complete tasks, and limited ability to demonstrate creativity and imagination during play. The evaluation also noted that he can sit at his workstation without working with anything and look around the room for extended periods during free time.

76.    The results of Ms. Anderson's Sensory Profile assessment led Ms. Anderson to suspect that T.S. could have autism.

77.    During her observations, Ms. Anderson witnessed T.S. fall out of his chair several times throughout the evaluation. He often asked repetitive questions about the activities and stopped working. He often engaged in talking, both off topic and, occasionally, on topic. T.S. demonstrated difficulty in transitioning between activities, often requiring repeated instruction and verbal cues to begin tasks, and difficulty initiating and resuming tasks when interrupted. T.S. demonstrated perseverative behaviors, including reciting the entire alphabet when provided examples. He often made noises and engaged in humming during the evaluation and was often distracted by noises outside of the evaluation setting. When an activity included a number of items, he would arrange the items by color or shape or size prior to beginning his work. He demonstrated a great deal of difficulty with sensory regulation. In Ms. Anderson's expert opinion, these observed behaviors were all indicators of autism.

78.    In Ms. Anderson's expert opinion, it is essential to conduct an autism evaluation to get a full picture of T.S.'s needs and that not doing so would be contrary to the law regarding the identification of students by evaluating in all areas of suspected disability. While Ms. Anderson

agrees that many of the observed behaviors may exist in both ADHD and autism, in her expert opinion, clinical observation and evaluation is important to determine the distinctions and to identify T.S.'s special education needs and the causes for the behavior.

79.    Ms. Anderson was unable to complete her evaluation due to the parents' actions revoking consent for a full individual evaluation, including autism.  In her expert opinion, without an autism evaluation, the evaluation could not be complete, the OT recommendations would be impacted, the ARD committee could not draft an appropriate IEP, it would affect the ability of the occupational therapist to serve the student, and it would not meet the student's needs.  In her expert opinion, the evaluators "are charged with the duty and responsibility to complete a comprehensive evaluation" and T.S. "needed to be evaluated for autism."

(3)    Expert and Evaluator Dr. Beth Palmer, M.Ed, M.S., PhD, LSSP, Suspected Autism and a Need for Education Services and Recommended Further Evaluation.

80.    Dr. Marian Beth Palmer has served as a Licensed Specialist in School Psychology (LSSP) at Dallas ISD since 2002.  She has also worked as a teacher, mental health consultant, adjunct professor of Psychology and Special Education, a private assessment specialist, counselor, and social skills program leader in her thirty-three (33) years of experience in education.  Dr. Palmer has a BS in Journalism from the University of Colorado; two Masters degrees from Texas A&M University at Commerce, a Maters of Science in Educational Psychology and a Masters of Education in Special Education; and a doctorate from Texas A&M University at Commerce in Educational Psychology.  She has been licensed as a LSSP from the Texas State Board of Examiners of Psychologists since 2002.  Dr. Palmer has extensive training in evaluating and serving students who are eligible for special education services under the IDEA as a student with autism ("AU").  Dr. Palmer also has extensive experience evaluating students suspected of having autism for special education services and has worked with students with autism for over thirty (30)

years.  Specifically, in the last three (3) years, she has conducted over two hundred fifty (250) evaluations for autism, and her caseload for serving students is made up primarily of students identified under the IDEA as AU.  Dr. Palmer is an expert in the field of school psychology and evaluating and serving students with autism and/or are suspected of needing services as a student with AU.

81.    Dr. Palmer initiated an evaluation of T.S. in November of 2018.

82.    An autism evaluation in Dallas ISD is conducted utilizing a multi-disciplinary, multi-person, multi-assessment, team approach which includes an LSSP, a diagnostician, a speech and language pathologist, and, often, an occupational therapist.  However, while the information is gathered as a team in Dallas ISD, the ultimate decision as to whether the child receives an autism diagnosis comes from the LSSP.  Specifically, to look at the whole child, including the social and emotional components of the child, the LSSP gathers data, interviews parents, administers either the ADOS or MIGDAS formal assessments, gathers information from the teacher, observes the student on campus in both structured and unstructured environments, consults with staff, and conducts the Childhood Autism Rating Scale.  The LSSP also distributes and analyzes the BASC and the ASRS autism rating scale to parents and teachers, writes the behavior section, and creates a functional behavior assessment and behavior intervention plan. The SLP focuses on social pragmatics, nonverbal communication, and verbal communication.  The diagnostician primarily looks at the cognitive and academic portion of the evaluation.  The OT will then address the sensory component.  This team approach is best practice, according to the trainings in the field, and is in compliance with the IDEA.

83.    According to Dr. Palmer, certain characteristics are often associated with autism, and, to determine whether a child is eligible as a student with autism (AU) under the IDEA, the

evaluators will look for differences in three areas:  (1) language and communication, (2) emotional response and social relatedness, and (3) sensory use and interests.  In the language and communication area, evaluators look for differences in how a child uses language and how they are using verbal and nonverbal communication – are they making eye contact, are they engaged in reciprocal conversation, how are they using pragmatic language.  In the emotional response area, evaluators are looking for differences in how a child uses emotions, gives off emotions, how they handle their own emotions.  Finally, in the sensory use area, evaluators look to see how a child engages with his/her senses and if there are any differences in the use of the senses.

84.    While a child would generally manifest or show characteristics of autism before age three (3), children can also be identified after age three (3) if they manifest the characteristics of autism, a developmental disability significantly affecting verbal and nonverbal communication and social interaction that adversely affects a child's educational performance. *See* IDEA definition of autism at 34 C.F.R. §300.8(c)(1)(iii) (stating that "a child who manifests the characteristics of autism after age three could be identified as having autism [under the IDEA] if the criteria in paragraph (c)(1)(i) are satisfied").  In fact, children with high-functioning autism have been diagnosed at all ages, even at the high school level.

85.    During T.S.'s evaluation, Dr. Palmer spoke with staff at the school, observed T.S. in different settings, reviewed the information in his referral folder, interviewed T.S., and consulted with other evaluators on the case.

86.    Based on the information that she learned from campus personnel, Dr. Palmer suspected that T.S. had more than a specific learning disability and that T.S. was exhibiting behaviors commonly seen in children with autism, including difficulty following directions and understanding classroom routines, rolling on the floor, disengagement, not being able to follow

simple directives, and a difficult time with self-regulation. Dr. Palmer also suspected that T.S. had autism based on Ms. Winners' observations that were included in the referral packet.  Specially, according to Winners' observations, T.S. did not understand what was happening in the classroom even after the counselor caught his attention and explained what to do. The observation suggested that T.S. was more than simply inattentive; he was lost and unable to engage in basic routines, such as asking for assistance.

87.    Based on her own observation of T.S. in the classroom, Dr. Palmer determined that T.S. had sensory-driven noise-making behavior (clicking his tongue), was disengaged, isolated in his own work, prompt dependent, and exhibited sensory-seeking behaviors. During recess, Dr. Palmer observed the following: T.S. did not understand the social routines of playing a game; T.S. did not know how to initiate interactions with children; and T.S. conducted sensory-seeking behavior by bumping into the children. During an interview of T.S., T.S. told Dr. Palmer that he did not have any friends and that he reversed his "r's" and "l's" when speaking. Across settings, Dr. Palmer has observed T.S. with a constant awkward grin, walking down the hallway with fingers up to the side of his head, following his own agenda, and engaging in sensory-seeking behaviors, such as body tensing and shoulder shrugging. These observed behaviors during the evaluation process further increased Dr. Palmer's suspicion of autism.

88.    In her expert opinion, Dr. Palmer believes the following observed behaviors of T.S. are consistent with characteristics of autism: total disengagement; prompt dependency; finger posturing; body tensing; fidgetiness; squirminess; lack of self-regulation; recklessness; loud and disruptive behavior; shifts from one unfinished task to another; lack of self-initiative; difficulty establishing relationships with peers; sensory-driven behaviors such as mouth noises and rolling on the floor; finger posturing; lack of social awareness; does not pick up on social cues; says he

has no friends; failure to engage in back and forth conversations; difficulty following directions and understanding classroom routines; different facial expressions and body movements; lack of self-initiative; difficult time establishing relationships with peers; clumsiness; and difficulty managing his feelings. Dr. Palmer does not believe these behaviors are indicative of only ADHD. Nor does she believe that a diagnosis of specific learning disability or an eligibility of occupational therapy and speech therapy alone would address T.S.'s social and emotional needs.

89.    Identifying autism is essential to understanding a child's underlying behaviors and planning accordingly.  High-functioning students with autism are at risk of being misdiagnosed, sometimes with ADHD behaviors, or unidentified in a school setting.  And, in Dr. Palmer's expert opinion, it is important to have an evaluation of all suspected disabilities "because you want a full understanding of the child.  You want to understand what are the underlying causes of the behaviors that the child is exhibiting, what are the underlying challenges that the child is facing, and how can we best address those within the school system so that the child can be successful."

90.    As Dr. Palmer emphasized, "I get nothing out of T.S. having an autism evaluation other than trying to understand the underlying causes of why he's having such great difficulty and such great challenges at school when he presents with high average IQ, when he comes from a family with educators, when he is supported by his family, when the school staff had been working with him, and it was February, what, five months into school, and he doesn't know what's going on."

(4)    <u>Even Parent's Own Autism Expert Indicated Suspicions of Autism that Should be Evaluated and T.S.'s Pediatrician Recommended an Evaluation.</u>

91.    While admitting that she only conducted a partial records review and has never directly observed T.S., Dr. Jennifer Morrison, PhD and LSSP, the parent's autism expert at the due process hearing, agreed that many of T.S.'s behaviors, which were observed by Dallas ISD campus

personnel and evaluators, could be characteristics of autism, including sensory-seeking behaviors (such as seeking opportunities to jump, crash, fall, or roll on the floor, squeezing hands tightly or hugging too tightly), needing and seeking out sensory input, oversensitivity to sound or noise, inability to follow one-step directions, prompt dependence, repeating phrases over and over, not participating in back-and-forth conversations, making repetitive noises, hyper focusing on certain topics or situations, disengagement from the classroom environment, inability to understand social cues, lack of social awareness, difficulty with transitions, difficulty with initiating tasks, difficulty with pragmatic language, difficulty maintaining attention or focus, difficulty with reciprocal conversations, playing on the periphery but not with other children, unusual body movements, creating systemic routines with tactile objects such as lining them up, engaging in repetitive sensory-based behaviors such as hand or body tensing, waving arms or flapping hands, displaying facial grimaces, lacking peer relationships, and not appearing to understand personal space or other social cues. In fact, as Dr. Morrison testified, it is possible that T.S. could have autism.

92.    Dr. Morrison also opined that a child with autism and a child with ADHD can look similar and have similar behaviors. Autism and ADHD can and often do occur at the same time; the same applies for autism and a specific learning disability and autism and dyslexia. While Dr. Morrison believes that many of these characteristics are comorbid with ADHD and that T.S. may have both ADHD and autism, she agrees that a full evaluation would be needed to determine whether the characteristics represent autism. In fact, while Dr. Morrison disagrees with the extent of the evaluation requested for T.S., Dr. Morrison agrees that some sort of assessment should be completed if there is a concern or suspicion of a disability and that an evaluation is a method of assessing a child's needs.

93.    On September 10, 2018, T.S. visited his pediatrician, Dr. Jacquelynn Longshaw,

with concerns regarding school. At that visit, the parent indicated T.S. "had difficulty with picking up academic concepts," "at home he is super hyper," "teacher says he just sits and does not do anything – not hyper at school," and "mom states that [T.S.] takes a long time to get his homework completed." T.S.'s mom further reported to Dr. Longshaw that T.S.'s "kindergarten teacher had similar concerns." Dr. Longshaw indicated that T.S. "is more socially immature compared to his twin sister. Would monitor for now. Advised talking to teacher about mom's concerns."

94.    T.S.'s parent contacted Dr. Longshaw on May 22, 2019. The notes section of the May 22, 2019 phone call states, "Mom requesting letter that Dr. Longshaw does not observe signs of Autism. It is ok to acknowledge that the child's diagnosis of ADHD contributes to child's behavior." Dr. Longshaw stated that she did not have concerns about autism but did recommend a formal evaluation by a developmental pediatrician. Dr. Longshaw also did not diagnose T.S. with ADHD. According to T.S.'s dad, as of the time of the due process hearing, T.S. has not yet been evaluated by a developmental pediatrician or anyone else for autism.

**H.    Parents Provide Outside Evaluation from Scottish Rite Which Provides Additional Information for FIE and Expands Evaluation.**

95.    During the pendency of Dallas ISD's evaluation, T.S.'s parents also had T.S. privately evaluated by Scottish Rite for dyslexia, and provided part of the Scottish Rite results to the District on January 22, 2019.

96.    The Scottish Rite evaluation received by Dallas ISD diagnosed T.S. with Dyslexia, Handwriting Problems, and ADHD.

97.    On or around February 5, 2019, T.S.'s parents received a complete report from Scottish Rite with additional information about Scottish Rite's evaluation, results, and recommendations, but this additional report was not provided to Dallas ISD until discovery in the due process hearing.

98.     Per standard protocol for Dallas ISD, Dr. Palmer reviewed the Scottish Rite evaluation and considered it as part of the full and individual evaluation. However, Dr. Palmer determined that additional testing was required. Scottish Rite does not test for autism during an evaluation. The information provided by the Scottish Rite evaluation alone was too limited to qualify T.S. for services under the IDEA for a specific learning disability. Moreover, the Scottish Rite evaluation does not indicate who conducted the evaluation.

99.     Further, while the Scottish Rite evaluation mentions ADHD, there is no indication in the report received by the District that a medical doctor participated in the evaluation as required for a diagnosis of Other Health Impairment under the IDEA. No other entity or doctor diagnosed T.S. with ADHD prior to this evaluation, and this was the first time the District was aware of an ADHD diagnosis.

100.    On February 5, 2019, Dr. Palmer contacted the parents to request that a physician complete the Other Health Impairment ("OHI") form based on the ADHD diagnosis by Scottish Rite. Neither the parents, nor a medical doctor, ever provided the District with the completed OHI form for T.S.

101.    Dr. Palmer did not receive the additional information from Scottish Rite that Dr. Jeffrey Black, a medical doctor at Scottish Rite, had reviewed and approved the diagnosis of ADHD.  Had Dr. Palmer known that a physician was involved in the diagnosis, she would have obtained a release for confidential information and sent it to the Scottish Rite physician.

102.    While Dallas ISD is required to consider the Scottish Rite evaluation, it is not required to accept the evaluation as part of the FIE.  The District has a right to do its own evaluation.  In fact, at the bottom of the more extensive report received by the parent, Scottish Rite specifically informed the parent that "the tests and/or diagnostic approach used in this center to

support an academic learning disorder diagnosis are not intended to replace the process public school educators are required to use by law or mandate to determine educational placement or services. While public schools' educators must consider assessment information that is presented for their review, they are not required to accept outside evaluations or recommendations for the purpose of determining educational services/placement."

## I.  Parent Revokes Consent for a Full and Individual Evaluation.

103.    On February 4, 2019, as soon as autism and ADHD were identified as suspected disabilities, Dr. Palmer immediately contacted the parent and informed the parent of the District's need to expand the evaluation to include further testing for autism and to gather additional information about the ADHD diagnosis.  While it was not necessary for the parent to sign another consent form, as the parent had already consented to a Full and Individual Evaluation in all areas of suspected disability, the LSSP wanted to notify the parent of the need to expand the evaluation and the specific rationale and reasons for the District's decision. At that time, the parent told Dr. Palmer that she could proceed with the autism evaluation and that T.S.'s home tutor had seen similar behaviors in T.S.

104.    Later that afternoon, however, T.S.'s mother sent Dr. Palmer an email asking her to hold off on the autism evaluation, as she needed time to speak with T.S.'s dad.

105.    Then, on February 5, 2019, in an email to Dr. Palmer, the mother indicated the following:  "I have spoken with [T.S.'s] dad and we have decided that we do not want additional testing at this time for Autism."

106.    On February 6, 2019, Dr. Palmer spoke with T.S.'s dad and explained the suspicions of autism and the need to conduct a full evaluation in all areas of suspected disability, including AU and ADHD.

107.    On or around the same time, T.S.'s mom reached out to Ms. Winners, the school counselor about the need for an autism evaluation.  Ms. Winners also explained the behaviors she observed in T.S. which made her suspect autism.  Mom expressed her fear to Ms. Winners of T.S. being labeled.

108.    Then, on February 7, 2019, the District received another email from T.S.'s mother reiterating that the parents decline additional evaluations for T.S. but would like for the cognitive and achievement parts of the evaluation to be completed.

109.    In these communications, the parents revoked their consent for the evaluation on February 4, 2019, and again on February 5, 2019, and February 7, 2019.  Dallas ISD considers a parent to have revoked consent where Dallas ISD is unable to conduct the full and individual evaluation in all areas of suspected disability and related services.  In fact, T.S.'s father admitted that his revocation of consent for an autism evaluation prevented Dallas ISD from assessing T.S. in all areas of suspected disability.

110.    On February 8, 2019, following a consultation with supervisors, Maudene Guillory and Dr. Judy Anderson, Dr. Palmer emailed the parent advising her that Dallas ISD would not be able to conduct a full and individual evaluation without the ability to evaluate for the suspected disability of autism. Dr. Palmer attached a revocation of consent for evaluation form and another copy of the IDEA Procedural Safeguards to the email.

**J.    For an initial FIE, T.S. must be evaluated in all areas of suspected disability in order to be provided FAPE.**

111.    Dr. Judy Anderson is an experienced LSSP with over thirty years of experience as a practicing school psychologist.  Dr. Anderson's areas of expertise include assessment, consultation, counseling, supervision and compliance with state and federal guidelines related to special education evaluations.  Dr. Anderson holds a BA in Psychology from the University of

North Texas, a Master of Arts in School Psychology from the University of North Texas and a Doctor of Philosophy in School Psychology from Texas Woman's University.  She has worked at Dallas ISD for over thirty (30) years and has held positions as Associate School Psychologist, LSSP, Lead Evaluator and Supervisor.  She is currently a Supervisor in the Individual Evaluation Program in the Special Education Department of Dalla ISD.

112.    According to Dr. Anderson, it is imperative for Dallas ISD "to tell the whole story" of the child during an evaluation.  The story begins with the reason for referral and looks at the following factors: the communicative status of the child; the background and sociological variables; any previous testing the child has that the parent may have provided; the child's educational history; parent information; teacher information; the child's attendance and/or access to education; movement from school to school; and their history of interventions.  Then, Dallas ISD looks at the tools that are unique to the profession of psychology and educational diagnostician assessments, like the cognitive evaluation, behavioral/emotional evaluations, achievement, speech and language, occupational therapy, and any related services that a child may need.  Dallas ISD believes that evaluations should be a collaborative process that involves gathering information from the parents, the teachers, and looking at the child's behavior and performance across settings. However, ultimately, it is the LEA's (or school district's) responsibility to ensure that a child is assessed in all areas of suspected disability and to provide an appropriate IEP.

113.    According to Dr. Anderson, completing T.S.'s assessments solely in the area of specific learning disability, dyslexia, occupational therapy, and speech would only provide a partial evaluation of T.S., which would fail to tell the entire story of the child in violation of the IDEA.  While it is true that a child who is identified as IDEA eligible in one category under the IDEA is able to access the whole continuum of services under the special education umbrella, a

full and individual evaluation is necessary to identify what specific special education services are needed and to provide an appropriate IEP as required under the law.

**K.    Parent files complaint with the TEA Complaints Division who rules against the District.**

114.    The parent filed a TEA complaint with the TEA Complaints Division on February 22, 2019, requesting that TEA require Dallas ISD to complete T.S.'s evaluation to address the specific learning disability, dyslexia, speech, and occupational therapy concerns for handwriting, but excluding any evaluation for autism.

115.    On or around April 17, 2019, Dallas ISD received the special education complaint investigative report from the TEA Complaints Division which found noncompliance on the part of Dallas ISD for failure to assess T.S. within the timelines set out by the Texas Administrative Code. Specifically, the TEA Complaint Division indicated that even though the district suspected autism, it should have "documented its suspicions of any additional areas of concern, noted that the parent declined additional testing, and completed the initial FIE."

**L.    Dallas ISD files a request for due process hearing to override Parents' lack of consent.**

116.    Following the decision from the Complaints Division of TEA, Dallas ISD filed a request for a special education due process hearing, requesting that the hearing officer allow Dallas ISD to override the parents' revocation of consent and evaluate T.S. in all areas of suspected disability.

117.    Under the IDEA, Dallas ISD has the right to pursue a full and individual evaluation by filing for a due process hearing to override a parent's lack of consent (or revocation of consent) and to appeal the TEA Complaint Divisions erroneous decision.

118.    The due process hearing was conducted in person on July 31 and August 12, 2019. Upon request by the Hearing Officer and Respondent, parties reconvened by phone on September

12, 2019 at Dallas ISD's disapproval.

119.    During the hearing, both sides were given an opportunity to present their case in chief.  However, on the last day, during Dallas ISD's cross examination of the Respondent's last and primary witness, the mother, without any warning, the hearing officer limited the amount of time Dallas ISD had to cross examine the mother and present its two rebuttal witnesses. Specifically, Dallas ISD's cross of the Respondent's main witness was limited and curtailed by the hearing officer to less than forty-five (45) minutes and Dallas ISD's rebuttal witnesses were limited to only five (5) minutes each.  This adversely affected Dallas ISD's ability to present rebuttal testimony and cross examine the Respondent's primary witness.

120.    The Hearing Officer issued her decision (the "Decision") on November 1, 2019. In the Decision, the Hearing Officer concluded that Dallas ISD did not meet its burden of proof and was not entitled to an order overriding lack of parental consent for a full and individual evaluation ("FIE").

121.    The hearing officer also concluded that the District failed to evaluate T.S. within a reasonable time after school officials had notice of behavior likely to indicate a disability and that the District failed to complete T.S.'s evaluation within the timelines established by the IDEA and its implementing state and federal regulations.

122.    As such, the District's request to complete a full evaluation of T.S. in all areas of suspected disability was denied.  However, the District was ordered to complete the evaluation in only the areas consented to by the Parent in November 2018 and to convene an ARD Committee meeting to consider this partial evaluation.

## VI.    CLAIMS ON APPEAL

Dallas ISD appeals the Decision of the Hearing Officer on several grounds.

**A.    The Hearing Officer erred in concluding that Dallas ISD did not meet its burden of proof and is not entitled to an order overriding lack of parental consent.**

123.    The Hearing Officer erred in concluding that Dallas ISD did not meet its burden of proof and is thus not entitled to an order overriding lack of parental consent.  While recognizing that "behaviors noted by District personnel may suggest Student has Autism," the Hearing Officer erred in finding that "reasonable grounds" did not exist to override parental consent for a Full and Individual Evaluation in all areas of suspected disability, including autism.

124.    A hearing officer in a special education due process hearing has the authority to override parental refusal to give consent for a full individual evaluation for identification and eligibility purposes under IDEA.   34 C.F.R. Sec. 300.507(a); 19 Tex. Admin. Code Sec. 89.1151(a).

125.    In order to override lack of parental consent, the school district must only prove by a preponderance of the evidence that: (i) there is a reason to suspect the student has a disability; and, (ii) there is a reason to suspect that the student is in need of special education.

126.    Although the school bears a preponderance-of-evidence burden, the threshold to prevail on a request to conduct an initial evaluation, i.e. "reason to suspect," is not high.   The impartial hearing officer's determination at this stage is not whether the child has a disability, merits an IDEA classification or 'label,' or is considered a 'special ed student.' Those are separate and subsequent determinations, subject to additional procedures and safeguards.   The only determination at this stage is whether the school has reason to suspect a disability and related educational need, and therefore should be ordered to evaluate the child notwithstanding lack of parent consent.

127.    The hearing officer ignored more than a preponderance of evidence in this case that Dallas ISD had a reason to suspect that T.S. had autism and related educational needs related to autism.  Specifically, the hearing officer ignored evidence of behaviors exhibited by T.S. during the 2018-2019 school year which raised suspicions of autism and a need for a Full and Individual Evaluation in all areas of suspected disability, including autism; evidence of numerous interventions provided to T.S. during the 2018-2019 school year with minimal progress which led to a suspicion of autism and a need for a Full and Individual Evaluation in all areas of suspected disability, including autism; evidence of information obtained and reviewed during the evaluation which led three exceptionally experienced evaluators and experts to suspect autism; and the testimony of the Parents' own expert in autism who indicated that autism was a possibility.

**B.    The Hearing Officer erred in not granting the District the right to conduct a Full and Individual Evaluation of T.S. in all areas of suspected disability before providing special education services to T.S.**

128.    The Hearing Officer erred in not granting the District the right to conduct a Full and Individual Evaluation of T.S. in all areas of suspected a disability, as required by the clear language of the IDEA, before providing special education services to T.S.

129.    In order to provide a free appropriate public education ("FAPE") to all children with disabilities, a school district must first identify those children and evaluate their disability conditions.  For this reason, the IDEA requires that local school districts "conduct a <u>full and individual initial</u> evaluation" of a child in accordance with IDEA evaluation procedures "*<u>before</u>* the initial provision of special education and related services" to that child.  20 U.S.C. § 1414(a)(1)(A) (emphasis added); 34 C.F.R. § 300.301(a).    Furthermore, the IDEA and its accompanying regulations contain an extensive set of procedural requirements that are designed to ensure that this initial evaluation achieves a <u>complete</u> result that can be reliably used to create

an appropriate and individualized educational plan tailored to the needs of the child.

130.    The hearing officer erred in ignoring the procedural requirements of the IDEA, which required Dallas ISD to complete a full and individual evaluation in all areas of suspected disability and needs *before* providing him with special education and related services.

**C.    The Hearing Officer erred in ordering the District to complete a partial evaluation of T.S. that did not assess him in all areas of suspected disability.**

131.    The Hearing Officer erred in ordering the District to complete a partial evaluation that did not assess T.W. in all areas of suspected disability.  The Decision failed to acknowledge that the IDEA mandates that the District's assess T.S. "in all areas of suspected disability."

132.    The Hearing Officer erred in finding that the District did not show it is essential to override lack of parental consent in all areas because "while behaviors noted by District personnel may suggest Student has Autism, they could also be related to his already identified disability of ADHD, which was already known to impact Student's success at school and required interventions." *See Decision at p. 12.*

133.    According to the IDEA, the initial evaluation must be designed not only to determine whether the child has a disability, but also to "determine the educational needs of such child." 20 U.S.C. § 1414(a)(1)(C).  To do that, the school district must "ensure that --- … the child is assessed in *all areas* of suspected disability." 20 U.S.C. § 1414(b)(3)(B)(emphasis added).

134.    The hearing officer's ruling ignores multiple courts and hearing officers which have held that the failure to assess a student in all areas of suspected disability and fully identify the student's needs in that area can constitute violations of the evaluation procedures of the IDEA.

135.    By ordering Dallas ISD to only evaluate T.S. in certain areas of suspected disability, i.e. specific learning disability (SLD), speech impairment (SI), and Other Health Impairment (OHI) for AHDH, the Hearing Officer fails to recognize that the IDEA mandates that Dallas ISD

assess T.S. in "all areas of suspected disability" when conducting a comprehensive evaluation. This procedure is necessary for Dallas ISD to determine what special education and related services will address all of T.S.'s individual needs. *See* 1412(a)(3)(A).

136.    The Hearing Officer further erred in finding that the District was required to conduct a partial evaluation only in the limited areas approved by Parents rather than a comprehensive, full evaluation as required by the IDEA, despite overwhelming case law recognizing a District's duty to assess in *all* areas of suspected disability and evidence that District professionals suspected autism and determined it necessary to test in these suspected areas.  In doing so, the Decision sets shocking new precedent allowing parents to "pick and choose" the areas in which a school district must evaluate their child. Additionally, the Decision ignores caselaw stating that the IDEA encourages parental input yet specifically charges the evaluation of the student and the framing of an adequate IEP to the school.

137.    The Hearing Officer erred by ignoring legal standards, treating Parents' concerns over labeling a child with a specific disability as being above the District's legally mandated duty to evaluate a student in all areas of suspected disability under the IDEA.  Moreover, the Hearing Officer erroneously places Parents' belief that T.S. does not have a certain disorder above the observations of trained, licensed, and experienced professionals within the District.

**D.    The Hearing Officer Erred in Finding that the District had sufficient information as of February 2019 to serve T.S. as a student with a disability under the IDEA and provide FAPE.**

138.    The Hearing Officer erred in ordering that the District should have simply completed the evaluation without fully identifying T.S.'s educational and behavioral needs because the evaluation had been underway for a certain period of time.  The Hearing Officer also erred by finding that "the information the District had gathered as of February 2019 was sufficient

to convene an ARD to develop a program to address Student's already identified educational needs." *See Decision at p. 12.* The Hearing Officer further erred by finding that a student's ARD Committee "can develop a program for whatever that child needs regardless of classification category." *See Finding of Fact 26.* Finally, the Hearing Officer erred in holding that the "District should have completed the FIE in the areas where consent had been obtained and work with the parents to develop a program to address Student's already identified disabilities and educational need." *See Decision at p. 13.*

139.    The Hearing Officer ignores the fact that, while the FIE should have been near completion by that time, the Parents' revocation of consent prevented the District from completing a comprehensive evaluation in all areas of suspected disability by using a variety of assessment tools and strategies by trained and knowledgeable professionals.

140.    As required by the IDEA, an evaluation must be sufficiently comprehensive to identify all the child's special education and related service needs, whether or not commonly linked to the disability category in which the child has been classified. 34 C.F.R. 300.304(c)(6).

141.    A comprehensive evaluation must use a variety of assessment tools and strategies, as well as technically sound instruments, to assess the relative contribution of cognitive, behavioral, physical, and developmental factors. 20 U.S.C. § 1414(b)(2)(A),(C); 34 C.F.R. § 300.304(b)(1),(3). This includes, if appropriate, an analysis of the child's health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities. Such information is necessary to assist the ARD Committee in determining the content of the child's IEP as required under the IDEA. 20 U.S.C. § 1414(b)(2)(A).

142.    Additionally, a school district may not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or for determining the

appropriate educational program for the child. 20 U.S.C. § 1414(b)(2)(B); 34 C.F.R. § 300.304(b)(2). A school district must also ensure that assessments and other evaluation materials are selected and administered so as not to be discriminatory on a racial or cultural basis. 20 U.S.C. § 1414(b)(3)(A)(i); 34 C.F.R. § 300.304(c)(1)(i). Finally, in conducting the evaluation, the school district must ensure that all assessments are conducted by trained and knowledgeable personnel, in accordance with instructions provided by the producer of the assessment, and for purposes which the assessments or measures are valid and reliable.  20 U.S.C. § 1414(b)(3)(A).  These procedural requirements for initial evaluations allow for complete and reliable results that can be used to create an appropriate and individualized educational plan tailored the child's specific needs.

143.    The results of an initial evaluation are critical to the creation of an individualized education plan (IEP) for a student to receive FAPE.  An IEP is created by an ARD committee after the team has considered the child's strengths, the parent's concerns about the child's education, and the results of the school district's initial evaluation of a child, which (if done appropriately) provides a complete picture of the child's specific academic, developmental, and functional needs. 20 U.S.C. § 1414(d)(3)(A)(iii); 34 CFR § 300.304(b)(1).  The underlying evaluation is fundamental to creating an appropriate educational program because an IEP must be tailored to a student's individual needs known at the time it is offered.  A comprehensive evaluation is thus necessary to understand the specifics of a child's current skills and needs and to develop an appropriate educational plan based on such needs.

144.    While it is true that the IDEA concerns itself not with labels, but whether a student is receiving FAPE, without complete evaluative information regarding all of a student's disabilities and needs, it is not possible for a school district to develop a plan reasonably calculated to provide

the student with a meaningful educational benefit.

145.    If a school district does not assess a student in all areas of suspected disability, then, in most cases, it cannot provide FAPE.

**E.    The Hearing Officer erred by finding that the District had sufficient information by February 2019 to serve the student under the IDEA as a student with Other Health Impairment (OHI) and a Specific Learning Disability (SLD).**

146.    The Hearing Officer erred by finding that the District had "sufficient information available to it to serve Student as a student with OHI based on ADHD and as a student with a Specific Learning Disability based on Dyslexia." *See* Finding of Fact No. 26.  The ADHD and Dyslexia diagnosis came from the Parent's private evaluation from Scottish Rite, of which only a partial report was provided to the District on January 22, 2019.

147.    By suggesting that the District should have developed a program to meet T.S.'s needs based on the Scottish Rite evaluation alone, the Hearing Officer's findings are in direct contradiction with the IDEA and Code of Federal Regulations, which prohibits the District from using any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or for determining the appropriate educational program for the child. 20 U.S.C. § 1414(b)(2)(B); 34 C.F.R. § 300.304(b)(2).

148.    Furthermore, this finding is in direct contradiction with precedent providing that the District is not obligated to rely on an outside evaluation for its assessment and that the District has an absolute right to conduct its own evaluation. As held by the Fifth Circuit (and many other circuits), if a student's parents want him/her to receive special education services under the IDEA, they must allow the school itself to evaluate the student, and they cannot force the school to rely solely on an independent evaluation.  There is no exception to the rule that a school district has a right to test a student itself in order to evaluate or reevaluate the student's eligibility under IDEA.

**F.    The Hearing Officer erred in ruling that the Parents did not revoke their consent for a Full and Individual Evaluation.**

149.    The Hearing Officer erred in ruling that T.S.'s parents did not deny the District an opportunity to evaluate him and readily consented to an FIE and that "reasonable grounds do not exist to override parents' consent for only one component of the FIE." *Decision at p. 13*.

150.    The Hearing Officer ignored the evidence that Dallas ISD was attempting to complete a comprehensive evaluation in all areas of suspected disability by using a variety of assessment tools and strategies by trained and knowledgeable professionals, but was prevented from doing so by the parents' revocation of consent.

151.    A parent's attempt to limit the scope of a full and individual evaluation to only certain areas of disability is equivalent to a lack of consent for an initial evaluation.

152.    The Hearing Officer ignored multiple due process hearing decisions and case precedent which found that an evaluation is composed of all the individual assessments related to the suspected disabilities.  While parents have the right to consent or refuse to consent to an entire evaluation, parents cannot choose individual tests which a school district will administer.  Since a district has an obligation to assess a student in all areas related to the suspected disability in order to determine all the student's needs, a parent cannot choose to consent to only specific assessments within the proposed evaluation.

153.    The Hearing Officer erred by finding that the parents' permission to only evaluate T.S. for some disabilities or needs, but not others, was not an attempt to limit the scope of the evaluation and an official revocation of consent. Without a full and comprehensive assessment, Dallas ISD was unable to assess in all areas of suspected disability or conduct a sufficiently comprehensive evaluation to identify all areas of suspected need.  Furthermore, under the law, Dallas ISD, not the Parents, have discretion in choosing the way the evaluation was conducted as

Dallas ISD is responsible for educating T.S. and providing for his individual needs.

154.    The Hearing Officer erred in requiring that Dallas ISD assess T.S. in only certain areas of suspected disability but not others. The IDEA mandates that Dallas ISD evaluate T.S. in all areas in which the District has notice of facts or behavior likely to indicate a disability. Thus, Dallas ISD sought to evaluate T.S. in *all* areas of suspected disability – to which the parents refused to consent.  Thus, the Hearing Officer erred in finding that the Parents did not revoke consent for a full and individual evaluation for T.S.

**G.    The Hearing Officer erred in finding that the District did not appeal the findings of the Complaints Division of TEA.**

155.    The Hearing Officer erred by finding that the District "did not appeal TEA's findings," as noted in the April 17, 2019 report from the Complaints Division of TEA.  *See Findings of Fact 28 and 29.*

156.    Texas does not have a procedure for appealing the findings of the Complaints Division of TEA.  Instead, the District's only option is to file a due process hearing over the same issues, which the District did so in the present action.

157.    The fact that a previous state complaint investigation reached a particular conclusion on an issue does not preclude or curtail the right of a party or agency to pursue the same issue(s) in a subsequent due process hearing.  As the federal Office of Special Education Programs (OSEP) has explained, "a party is not required to forego due process on issues previously addressed through the SEA's administrative complaint process." *Letter to Lieberman*, 23 IDELR ¶ 351 (OSEP 1995).   Indeed, OSEP has specifically stated that while the result of a previous SEA complaint investigation may be used as evidence in a subsequent due process hearing, it has no binding, controlling, or determinative effect on the hearing. "In fact, a due process decision [or federal court appeal] will prevail over a conflicting result of a SEA complaint investigation that

addresses the same matter […]." *Letter to Lieberman*, 23 IDELR ¶ 351.

**H.    The Hearing Officer erred in implying that a medical diagnosis of autism is necessary for a student to be identified as AU under the IDEA.**

158.    The Hearing Officer erred by seeming to imply that a medical diagnosis of autism and/or medical input is necessary for a student to be suspected of having an IDEA eligibility of autism.  Specifically, the hearing officer in the Decision noted that "no qualified medical provider has diagnosed student with Autism.  Student was evaluated by a pediatrician in May 2019, who noted no signs of neurobiological condition."  *See Finding of Fact No. 30.*  Such finding is not only unsupported by the evidence, it ignores the clear language of the IDEA regarding the procedures for evaluating suspected disabilities and the use of outside medical information.

## VII.    REMEDIES REQUESTED

159.    Dallas ISD respectfully requests that the Court reject the Hearing Officer's Decision and render a judgment in favor of Dallas ISD.

160.    Dallas ISD respectfully requests that the Court reverse the Decision of the Hearing Examiner for the reasons set forth herein, and requests that the conclusions of law and applications of fact to law found by the Hearing Examiner be entitled to no deference by this Court.

161.    Dallas ISD respectfully requests that the Court make the following findings:

a.    Behaviors exhibited by T.S. during the 2018-2019 school year raised suspicions of autism and a need for a Full and Individual Evaluation in all areas of suspected disability, including autism.

b.    Numerous interventions provided to T.S. during the 2018-2019 school year with minimal progress led to a suspicion of autism and a need for a Full and Individual Evaluation in all areas of suspected disability, including autism.

c.    T.S.'s parent originally consented to a Full and Individual Evaluation of

T.S. in all areas of suspected disability.

d.    Information obtained and reviewed during the evaluation led all three experienced evaluators to suspect autism, and thus Dallas ISD was required by law to expand the initial evaluation to include all areas of suspected disability, including autism.

e.    A Full and Individual Evaluation in all areas of suspected disability is required by law before Dallas ISD can provide special education services to T.S.

f.    Dallas ISD was required and attempted to use a variety of assessments to conduct a comprehensive evaluation of T.S. in all areas of suspected disability and need with trained and knowledgeable personnel.

g.    A school district has an absolute right to conduct its own evaluation with its own selected personnel and is not required to rely solely on an independent evaluation provided by the parents.

h.    A complete evaluation in all areas of suspected disability, including autism, is necessary to provide T.S. with a free appropriate public education (FAPE) under the IDEA.

i.    The Parents' actions in February of 2019 of refusing to allow Dallas ISD to conduct an autism evaluation or assess T.S.'s social and emotional needs as it relates to autism constituted a revocation of consent for a full and individual initial evaluation and a forfeiture of FAPE.

j.    Due to the revocation of consent by the Parents, Dallas ISD was not obligated to complete T.S.'s FIE within the timelines established by the

IDEA and its implementing state and federal regulation.

k.     Due to the revocation of consent, Dallas ISD did not fail to evaluate T.S. within a reasonable time after school officials had notice of behavior likely to indicate a disability.

162.   Dallas ISD respectfully requests that Court issue an order overriding the Parent's lack of consent for a Full and Individual Evaluation of T.S. and allow the District to fully evaluate T.S. in all areas of suspected disability, including autism.

## VIII.   PRAYER

WHEREFORE, Plaintiff Dallas ISD prays that the Court receive the records of the administrative proceedings, accept additional evidence if requested, and that the Court award Dallas ISD the remedies requested above, reasonable fees and costs of suit, and grant all other relief the Court deems appropriate and just, at law or in equity.

DATED:     January 27, 2020.

Respectfully submitted,

THOMPSON & HORTON LLP

/s/ Dianna D. Bowen
Dianna D. Bowen
State Bar No. 24013778
dbowen@thompsonhorton.com

500 N. Akard St., Suite 3150
Dallas, Texas 75201
(972) 734-5416 – Telephone
(972) 534-1547 – Facsimile

*Attorney for Plaintiff Dallas ISD*